FILED
2013 Dec-16  AM 09:56
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| JOHNNY COPPETT, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-11-S-4227-NE |
| | ) | |
| TENNESSEE VALLEY | ) | |
| AUTHORITY, *et al.,* | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Johnny Coppett, filed this case on December 15, 2011, asserting claims for violations of Sections 501 and 504 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 791, 794, and a supplemental state law claim for outrage, against the following defendants:  his employer, the Tennessee Valley Authority ("TVA"); Tom Kilgore, the "head" of TVA; Dennis Bottorff, Chairman of the Board of Directors of TVA; and Marilyn A. Brown, Mike Duncan, Tom Gilliland, William Graves, Barbara S. Haskew, Richard Howarth, Neil McBride, and William B. Sansom, the members of the TVA Board of Directors.  All individual defendants were sued in their respective official capacities only.[1]

Plaintiff later conceded the dismissal of his outrage claim, and he also conceded

---

[1] *See* doc. no. 1 (Complaint).

that his Rehabilitation Act claims against TVA and Tom Kilgore were due to be dismissed because the members of the TVA Board of Directors are the only proper defendants.[2]  Additionally, the court granted defendants' motion for judgment on the pleadings with regard to any of plaintiff's Rehabilitation Act claims arising out of a failure to promote in 2003 and a demotion in 2006.[3]  The remaining defendants — *i.e.,* Bottorff, Brown, Duncan, Gilliland, Graves, Haskew, Howarth, McBride, and Sansom — have moved for summary judgment on the remaining aspects of plaintiff's Rehabilitation Act claim,[4] and that motion currently is before the court.  Upon consideration of the motion, briefs, and evidentiary submissions, the court concludes that the motion should be granted.

## I. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In other words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear

---

[2] *See* doc. no. 29 (memorandum opinion and order on motion for judgment on the pleadings), at 21-22.

[3] *See id.* at 22.

[4] Doc. no. 35.

the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)). Inferences in favor of the non-moving party are not unqualified, however. "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983) (alteration supplied). Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (emphasis and alteration supplied). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

## II. SUMMARY OF FACTS

### A.    TVA Position Requirements

3

The Tennessee Valley Authority ("TVA") is a corporate agency and instrumentality of the United States.  It operates the Browns Ferry Nuclear Power Plant in Athens, Limestone County, Alabama ("Browns Ferry").  *See* 16 U.S.C. §§ 831-831ee.  TVA employs a variety of trades and labor personnel to complete necessary maintenance tasks at Browns Ferry.[5]  Before the year 2000, all of the trade and labor work at Browns Ferry was performed by members of various craft unions, and there were strict rules about what types of work could be performed by the members of each union.[6]  In 2000, TVA and the various craft unions agreed to eliminate the strict "jurisdictional" boundaries that segregated tasks among the craft unions, and to instead transition to "multiskill" classifications for craft employees. The purpose of the multiskill program was to develop employees who possessed multiple, cross-craft skills, thereby increasing plant efficiency and minimizing work interruptions.[7]

Under the multiskill program, employees who previously had been classified as journeymen would be reclassified as Level 2 Nuclear Maintenance Technicians ("Tech 2's"), and would be paid 100% of their former craft wage.[8]  All Tech 2's were

---

[5] Defendants' evidentiary submission, Volume II (Declaration of Priscilla Carthen) ¶ 2.

[6] *Id.* ¶ 3.

[7] *Id.* ¶ 4.

[8] *Id.* ¶ 6.

paid the same union-negotiated salary.[9]   After completing all of the training and service requirements under the multiskill program, craft employees were eligible for a promotion to either a Level 3 or Level 4 Nuclear Maintenance Technician position ("Tech 3" or "Tech 4"), and would be paid a premium of either five percent (for Tech 3) or ten percent (for Tech 4) above the regular rate for a Tech 2.[10]

The purpose of the Tech 2 position is to perform a wide variety of electrical maintenance tasks within the plant, including: repairing breakers, motors, switch gear, and related electronic equipment; repairing and replacing battery systems; maintaining generators; repairing or replacing lighting; and operating overhead cranes.  The essential functions of the Tech 3 position include all of the requirements of the Tech 2 position, plus the ability to perform multiple cross-craft duties, such as mechanical work.  Because a Tech 3 possesses a wide variety of skills, he or she often is able to independently complete a job that previously would have required a crew comprised of multiple employees from different crafts.[11]   All essential functions of the Tech 2 and Tech 3 positions are performed inside the Browns Ferry plant.[12]

In October of 2004, TVA adopted Employment Policy Number 18 to address

---

[9] *Id.* ¶ 8.

[10] *Id.* ¶ 7.

[11] Defendants' evidentiary submission, Volume II (Declaration of Priscilla Carthen) ¶ 9.

[12] *Id.* ¶ 11.

multi-skill employees with medical constraints.[13]   That policy provides, in pertinent part, that "[f]or current employees to be qualified for a multi-skill position of Level 3 or 4 or to continue holding the position of a Level 3 or 4 Technician, they must be able to perform the essential functions of the position in all areas of the plant/facility."[14]   The policy also provides that

> TVA should not pay a premium for employees who cannot perform the essential functions and meet the physical requirements of the multi-skilled classifications.  TVA will continue to provide reasonable workplace adjustments as appropriate.  If an employee has completed a level of multi-skill training and is receiving a multi-skill premium, TVA may rescind the premium pay if the employee has an indefinite medical constraint that prevents him/her from performing the essential functions of the job.[15]

The policy also states the following with regard to employees on indefinite medical constraints after they have completed at least one level of multi-skill training:

> Employees (including foremen) who are placed on indefinite medical constraints after completing at least one level of multi-skill training must be medically evaluated by a TVA physician/medical vendor and be able to safely perform the essential functions of the job. A functional capacity test may be ordered by the TVA physician as part of the medical exam to help ensure an employee's ability to meet the physical requirements of the multi-skill position. . . .  [I]f they are medically not approved or unable to safely perform the essential functions, . . . they will be reclassified to the highest level they have achieved for which they can perform the essential functions. . . .  [I]f

---

[13] *Id.* ¶ 13.

[14] Carthen Declaration, Exhibit 4 ("Multi-Skill Employees with Medical Constraints") § 1.2 (alteration supplied).

[15] *Id.* § 1.3

they cannot perform the essential functions of a Level 3 Technician, they will be reclassified as a Level 2 Technician. TVA management may identify workplace adjustments as appropriate to assist employees in performing the essential functions of their position.

. . . . If the employees who are placed on indefinite medical constraints cannot perform the essential functions of a Level 2 Technician, they must identify employment alternatives within TVA or consider termination.[16]

## B.   Plaintiff's Medical Condition and Employment History with TVA

Plaintiff began working for TVA in October of 1983.[17] He became an electrical craft technician in June of 1991.[18]

### 1.   MS diagnosis

Plaintiff was diagnosed with multiple sclerosis (MS) in August of 2003.[19] That condition causes him to experience occasional temporary loss of sight, numbness, tingling and burning sensations, nerve pain, and loss of balance. His ability to walk is limited, as is his ability to be exposed to high temperatures.[20] He takes medication that alleviates some of his symptoms, and he uses a scooter to mobilize.[21]

The physician who diagnosed plaintiff with MS stated, in a letter dated August

---

[16] *Id.* § 1.10 (alterations supplied).

[17] Defendants' evidentiary submission, Volume III (Deposition of Johnny Coppett), at 16.

[18] *Id.*

[19] *Id.* at 19.

[20] *Id.* at 20-32.

[21] *Id.* at 29-30.

26, 2003:

> [Plaintiff] will not be able to continue his job at Brownsferry [*sic*] Nuclear Plant as an electronics maintenance tech because of the possibility that he might have another seizure and the possibility also that he might not be physically able to carry it out due to the Multiple Sclerosis.  I have asked him to seek a position at Brownsferry [*sic*] which is less demanding and he says that he has already done so.[22]

Plaintiff acknowledged during his deposition that, while he could occasionally enter the plant to perform some work tasks, he could not safely work in the plant on a daily basis due to his physical and environmental limitations.[23]  Nevertheless, he is able to perform the administrative duties that are discussed below, and the administrative work actually helps to divert his attention from the pain associated with his condition.[24]  Plaintiff occasionally expends sick leave in order to attend pre-planned doctor's appointments, but it is very rare for him to unexpectedly miss work due to MS-related symptoms.[25]

### 2.    Dual rate foreman, to outage walkdowns, to work order closure foreman

Pursuant to his doctor's instructions, plaintiff sought a less physically demanding position in August of 2003, and he was assigned to become the dual rate

---

[22] Coppett Deposition, Exhibit 1 (August 26, 2003 letter from Dr. Richard Hull), at 1 (alterations supplied).

[23] Coppett Deposition, at 40-46, 68.

[24] *Id.* at 26-28, 39.

[25] *Id.* at 58-60.

8

foreman.[26]  Soon after that, he was assigned to perform Outage Walkdowns, which is a purely administrative position, although it did occasionally require plaintiff to walk through the plant.[27]  Since 2004, with some temporary exceptions discussed more fully below, plaintiff's primary task has been to complete work order closures, which also is purely administrative in nature.[28]  Even though he was assigned to administrative duties, plaintiff remained classified as a Tech 2, and he was compensated at the Tech 2 level, except for when he received temporary salary supplements, which will be discussed more fully below.[29]

In 2004, plaintiff filed a union grievance regarding TVA's failure to promote him to a Tech 3 or Tech 4 under the multiskill program.  TVA formed a Workplace Evaluation Team to evaluate plaintiff's grievance.[30]  The Team's report stated:

> Mr. Coppett was recently diagnosed with Multiple Sclerosis (MS). This is not a service-related condition.  Mr. Coppett has a Job Duty Approval Status of Conditional and currently has the following medical constraints (as of 6/9/04):  No climbing and No strenuous type work. His personal physician provided the basis for these constraints and TVA physician concurred.
>
> Mr. Coppett is currently only performing a portion of his current job duties — walk downs.  Management has indicated that, with his

---

[26] *Id.* at 72-73.

[27] *Id.* at 74-76.

[28] *Id.* at 91-92.

[29] Carthen Declaration ¶ 14.

[30] *Id.* ¶ 16.

current restrictions, he cannot perform the essential functions of the level 3 technician position.  The employee has completed level 3 training, but is not receiving the level 3 premium.[31]

The Team recommended that, "Since Mr. Coppett cannot perform the essential functions of the level 3 technician position, he should not be classified as such."[32]

Plaintiff agreed during his deposition that, at least from 2006 forward, he could not safely work in a nuclear power plant on a regular, full-time basis.[33]  He also agreed that he cannot perform any of the following functions, all of which are essential to the Tech 2 and Tech 3 positions:  being exposed to high temperatures; working near rotating or energized equipment; working around open grating; working around steep inclines; working in confined spaces; walking for more than ten minutes; climbing ladders or scaffolding; crouching; and stooping.[34]

### 3.    Training Center

In 2006, plaintiff experienced an exacerbation of his MS that required him to take sick leave for an extended period of time.[35]  While plaintiff was out on sick leave, TVA removed him from his position as foreman over work order closures and reduced

---

[31] Carthen Declaration, Exhibit 6, at 1.

[32] *Id.*

[33] Coppett Deposition, at 68-69.

[34] *Id.* at 30, 40-48, 51-53, 119-125.

[35] *Id.* at 67-68, 157-59.

his pay by eighteen percent.[36]  Plaintiff made a verbal complaint to Wayne Willis, his union steward, about the decrease in pay.  In resolution of plaintiff's complaint, Mr. Willis arranged for plaintiff to assume a position scheduling training courses, and performing occasional instructional tasks, at the Browns Ferry Training Center, beginning in early 2007.[37]  The Training Center is an office environment, and it is easier to physically access than the plant itself.[38]  Plaintiff received a premium instructor's wage while he worked at the training center, equal to the wage he previously had received as foreman over work order closures.[39]  Plaintiff subjectively understood from his discussions with Mr. Willis that his assignment to the Training Center was permanent, because Willis did not inform plaintiff of any time constraints when he was discussing the position with him.[40]  Despite that belief, however, plaintiff's employment records indicate that the assignment was temporary,[41] and there is no evidence that Mr. Willis had the authority, acting alone, to create a permanent position for plaintiff.[42]

In general, to staff the Training Center, TVA temporarily assigns trade and

---

[36] *Id.* at 158.

[37] *Id.* at 157-63, 378.

[38] Defendants' evidentiary submission, Volume V (Declaration of Pete Branton) ¶ 2.

[39] Coppett Deposition, at 162-63.

[40] *Id.* at 163.

[41] Carthen Declaration ¶ 14 and Exhibit 5.

[42] Carthen Declaration ¶ 17.

labor employees who are members of the "instructor pool" to serve as instructors.[43]

To serve as an instructor, an employee must complete an 80-hour instructor training

course that is offered only when TVA needs instructors.[44]   Pursuant to TVA's

agreement with the unions, TVA selects employees to attend instructor training from

a list of employees who have signed an "Expression of Interest" form posted by the

union job steward.[45]   The last Expression of Interest form that is relevant to plaintiff's

claims was posted by the union steward during the spring of 2006.[46]   After completing

instructor training, employees are included in the instructor pool.[47]   Members of the

instructor pool are not guaranteed instructor assignments; instead, TVA makes

temporary instructing assignments from the instructor pool on an as-needed basis.[48]

When employees are assigned to work as instructors, they are paid a premium

instructor wage, in addition to their regular wage, for the duration of the assignment.[49]

Additionally, to maintain an instructor certification, an employee must spend at least

40 hours each year performing in-plant activities.   That requirement is in place

---

[43] Branton Declaration ¶ 3.

[44] *Id.* ¶ 4.

[45] *Id.*

[46] Defendants' evidentiary submission, Volume VI (Defendants' Combined Verified Responses to Plaintiff's First Interrogatories and Requests for Production), at 13 (Responses to Interrogatories 5 & 6).

[47] Branton Declaration ¶ 5.

[48] *Id*.

[49] *Id.* ¶ 6.

because TVA believes that, in order to effectively instruct other employees about safety and other procedures, an instructor should be familiar with the plant and its operations.[50]   Most courses taught by instructors are full-day courses lasting approximately eight hours each day.  There are limited courses that are shorter than eight hours, but those are not offered with sufficient frequency to justify assigning a single employee to teach shorter courses on a full-time basis.[51]

Plaintiff did not know about the requirement to sign an Expression of Interest form in order to be considered for instructor training.  Thus, he never signed any such form.[52]  Instead, plaintiff verbally expressed his interest in taking an instructor training course to Susan Camargo, his supervisor at the Training Center.[53]  Plaintiff never received any instructor training, and he was never included in the instructor pool.  However, plaintiff testified during his deposition that he was never denied the opportunity to attend an open training course in which he had expressed interest.[54]  When an instructor training course eventually was offered in 2012, plaintiff was invited to take the course, but he declined because he no longer was interested in

---

[50] *Id.* ¶ 8.

[51] *Id.* ¶ 9.

[52] Coppett Deposition, at 193.

[53] *Id.* at 174-75, 188-89.

[54] *Id.* at 190-92.

receiving the training.[55]

There were no *permanent* instructor positions at Browns Ferry from 2006 to 2010.[56]  Instead, all instructors were assigned to their positions on a temporary basis. During time periods when TVA did not need instructors, or when management determined that employees currently serving as instructors could be more effectively used in the plant, instructors were reassigned to their previous, permanent positions, and they were returned to their previous salaries, without any supplemental instructor pay.[57]

Plaintiff was busy with his training scheduling duties in 2007 and 2008.  In fact, the work level actually increased in 2008 as compared to 2007, such that another instructor was brought in to help teach the additional courses that were being scheduled.[58]  Even so, in May or June of 2008, plaintiff had to take sick leave for approximately two weeks after his work station chair broke while he was sitting in it.[59] In June of 2008, while plaintiff was still on leave, TVA reassigned *all* of the employees who had been temporarily reassigned to the Training Center to their

---

[55] *Id.* at 215-16.

[56] Carthen Declaration ¶ 20.

[57] Branton Declaration ¶ 10.

[58] Coppett Deposition, at 170-71.  Defendants dispute this statement, relying instead on the declaration of Pete Branton, who stated that the work level in the Training Center actually decreased during the latter part of June 2008.  Branton Declaration ¶ 13.  Plaintiff's version of events must be accepted as true for purposes of summary judgment.

[59] Coppett Deposition, at 172.

previous positions.[60]   Plaintiff was returned to his previous position as a Tech 2, performing work order closures, and he ceased receiving the premium instructor's wage.   A supervisory Training Center employee named Mike Phillips took over plaintiff's duties as Training Schedule Coordinator, and he additionally performed instructional duties.[61]

Approximately two weeks later, or sometime in July of 2008, TVA selected employees from the instructor pool for reassignment to instructor positions (and for receipt of supplemental instructor pay) at the Training Center.   Plaintiff was the only employee who was *not* returned to a position at the Training Center.[62]   According to TVA, plaintiff was not returned to the Training Center because he had not completed instructor training and was not a member of the instructor pool, so he could not teach courses.[63]   He also was not reassigned to the task of scheduling training courses, because the number of training courses to be scheduled had decreased, and there was consequently less of a need for schedulers.   Additionally, TVA needed plaintiff to assist with work order closures so that other Techs could work in the plant.[64] Moreover, to fully support both training and plant needs, any employee reassigned to

---

[60] Branton Declaration ¶11.

[61] Coppett Deposition, at 172-78.

[62] Branton Declaration ¶ 12; Coppett Deposition, at 182-83.

[63] Branton Declaration ¶ 12.

[64] *Id.* ¶ 13.

the Training Center needed to be able to perform *both* instructing and scheduling functions.  If TVA had temporarily reassigned plaintiff to scheduling duties, it would have had to reassign an additional employee to instruct the courses plaintiff was incapable of instructing.[65]

When plaintiff learned that he had not been reassigned to the Training Center, he requested instructor training, but TVA was not offering instructor training at that time because the instructor pool was full.[66]  TVA also questioned whether plaintiff could complete the instructor training requirements, because he could spend only a limited amount of time working inside the plant.[67]  Plaintiff acknowledged that he would be unable to teach any courses lasting eight hours.[68]  He did, however, have the physical ability to teach two-hour courses.[69]

Plaintiff filed an internal EEO complaint in October of 2008, asking for reassignment to his former position in scheduling or, in the alternative, to be allowed to receive instructor training.[70]

### 4.    Work order closures again

---

[65] *Id.*

[66] *Id.* ¶ 14.

[67] Coppett Deposition, at 40-46, 68.

[68] *Id.* at 210.

[69] *Id.* at 184.

[70] *Id.* at 187-88.  The court could not locate a copy of this complaint in the record.

It is undisputed that plaintiff effectively carried out his duties performing work order closures.[71]  Between December 2008 and May 2009, plaintiff worked on the same shift and in the same room as Phyllis Ricks.  Ms. Ricks was a Tech 3 employee, but she performed the same administrative work as plaintiff.[72]

## C.    Significant Events of May 2009

Several events occurred in May of 2009 that are significant to plaintiff's claims. It is not entirely clear from the record which event occurred first.  All of the events were affected by certain federal regulations to which TVA is subject.

### 1.    Relevant federal regulations

The regulations of the Nuclear Regulatory Commission ("NRC") require the Commission's licensees to establish and maintain "a physical protection system which will have capabilities for the protection of special nuclear material at fixed sites and in transit and of plants in which special nuclear material is used."  10 C.F.R. § 73.1(a). Part of that requirement is the establishment of an access authorization system.  10 C.F.R. § 73.56(a)(2).  The access authorization program must "provide high assurance that the individuals who [are granted unescorted access] are trustworthy and reliable, such that they do not constitute an unreasonable risk to public health and safety or the common  defense  and  security,  including  the  potential  to  commit  radiological

---

[71] *Id.* at 198.

[72] *Id.* at 236-37, 243-45.

sabotage." 10 C.F.R. § 73.56(c) (alteration supplied).  To accomplish that purpose, all individuals who are granted unescorted access will be subject to a Fitness-For-Duty ("FFD") program.  10 C.F.R. § 26.4(b).  Each organization's Fitness-For-Duty program must "[p]rovide reasonable assurance that individuals are not under the influence of any substance, legal or illegal, or mentally or physically impaired from any cause, which in any way adversely affects their ability to safely and competently perform their duties."  10 C.F.R. § 26.23(b) (alteration supplied).  The program also must "[p]rovide reasonable assurance that the effects of fatigue and degraded alertness on individuals' abilities to safely and competently perform their duties are managed commensurate with maintaining public health and safety." 10 C.F.R. § 23.23(e) (alteration supplied).  Each organization also must maintain a behavioral observation program

> to detect behaviors that may indicate . . . impairment from fatigue or any cause that, if left unattended, may constitute a risk to public health and safety or the common defense and security.  Individuals who are subject to this subpart shall report any FFD concerns about other individuals to the personnel designated in the FFD policy.

10 C.F.R. § 26.33 (alteration supplied).

TVA's nuclear security organization is responsible for granting unescorted access, and for administering TVA's Fitness-For-Duty and Behavioral Observation

18

programs.[73]  Plaintiff had nuclear unescorted access at the Browns Ferry plant in 2009.[74]  Maintaining that access was an essential function of all Tech positions, including plaintiff's, even while he was performing administrative duties.[75]

### 2.    May 15, 2009 meeting with John Alfultis and subsequent grievance

On May 15, 2009, plaintiff met with John Alfultis, who then was his supervisor, to complain that other employees with health issues were working as Tech 3's, while he had not been allowed to ascend beyond the level of a Tech 2 because of his own health issues.[76]  Specifically, plaintiff complained that Phyllis Ricks was performing the same work order closure tasks as him, but she was being paid as a Tech 3.[77]  Mr. Alfultis explained to plaintiff that Ms. Ricks was only temporarily performing light duty assignments while she recovered from surgery, but that she normally was able to perform all the duties of the Tech 3 position.[78]  Alfultis observed that plaintiff was unreasonable, agitated, argumentative, and confrontational during the May 15th meeting, although Alfultis generally found plaintiff to be a reasonable, calm, and cooperative person.[79]

---

[73] Defendants' evidentiary submission, Volume IV (Declaration of John Alfultis) ¶ 3.

[74] *Id.* ¶ 4.

[75] Carthen Declaration ¶ 10 and Exhibit 3.

[76] Coppett Deposition, at 218-21.

[77] Alfultis Declaration ¶ 7.

[78] *Id.* ¶ 8.

[79] *Id.* ¶¶ 9-11.

Plaintiff testified during his deposition that, in May of 2009, the fatigue he experienced did not affect his ability to work, other than requiring more time than usual to use the bathroom facilities.  He also felt that his symptoms did not affect his ability to concentrate or cause him to have a shorter temper.[80]

Plaintiff filed a grievance with his union on May 18, 2009, asserting that he had been discriminated against in his level of pay based on disability and reverse discrimination.[81]  During his deposition, plaintiff identified five other employees with medical conditions — Amanda Kilborn, Phyllis Ricks, Ed Minyard, Steve Watson, and Kenneth Gandy — who were compensated at the Tech 3 level while performing administrative tasks like outage walkdowns and work order closures.[82]  Even so, he was not able to identify any of those employees who had *permanent* restrictions like his own.  Plaintiff did not know the details about each of the other employees' respective medical conditions, but he did know that Amanda Kilborn was temporarily unable to wear a scuba outfit because she had a shoulder injury and needed surgery,[83] Phyllis Ricks had anemia,[84] and Ed Minyard had suffered a back injury that required

---

[80] Coppett Deposition, at 109-112.

[81] Coppett Deposition, at 220-23.  The court could not locate any copy of a written grievance in the record, but it is undisputed that one was submitted.

[82] *Id.* at 127-28.

[83] *Id.* at 128-31.

[84] *Id.* at 131-33.

surgery.[85]

### 3.    Complaints about plaintiff's behavior and subsequent investigation

Sometime during May of 2009, Alfultis received two complaints about plaintiff from co-workers.[86]   The first complaint was that plaintiff was having increased difficulty walking, that his entire body sometimes shook, and that he appeared unable to safely move around the office.[87]   The second complaint was that plaintiff was becoming territorial about his work, that he refused to cooperate or communicate with his coworkers, that he would spend long periods of time staring at his computer, and that he was not receptive to feedback.[88]

Alfultis believed that he was required by TVA policy and federal regulations to relay those complaints to TVA's nuclear access organization.[89]   Alfultis submitted a "Behavior Observation Program (BOP) – Annual Supervisor Review" form about plaintiff on May 29, 2009.  He indicated that there had been changes in plaintiff's work behavior, social interaction behavior, and personal health behavior.[90]   He elaborated that plaintiff's attention to detail and quality of work had declined over the

---

[85] *Id.* at 140-43.

[86] Alfultis Declaration ¶ 4.

[87] *Id.* ¶ 5.

[88] *Id.* ¶ 6.

[89] *Id.* ¶ 12.

[90] Alfultis Declaration, Exhibit 3 (Behavior Observation (BOP) - Annual Supervisor Review), at 1.

past month, that plaintiff seemed to be dismissing or rationalizing errors when coached, that coworkers had reported plaintiff's inability to focus, and that plaintiff did not cooperate with his co-workers and chain of command.  Alfultis also stated that plaintiff had repeatedly voiced animosity toward his co-workers and superiors, acted withdrawn and sulky when he did not get his way, demonstrated increasingly argumentative behavior, and become less receptive to reason.  Finally, Alfultis stated that co-workers had observed an increase in plaintiff's body shakes, a decrease in his muscle control, a propensity for plaintiff to call security personnel to assist him to his vehicle, and a tendency to express concern about a conspiracy against him.[91]

TVA's Fitness-For-Duty policy requires a Fitness-For-Duty evaluation anytime "there are indications that an individual may be in violation of [the] FFD policy or is otherwise unable to safely and competently perform his or her duties."[92]  It is TVA's policy to suspend an employee's nuclear unescorted access during a Fitness-For-Duty evaluation.[93]

Plaintiff's unescorted access was suspended on May 28, 2009.  Because that access level was required for plaintiff's job duties, he was not allowed to return to

---

[91] *Id.* at 2.

[92] Alfultis Declaration, Exhibit 1 (TVA NPG Standard Programs and Processes, Fitness-For-Duty, SPP-1.2, Rev. 0012), at 41.

[93] *Id.* at 43.

work until the Fitness-For-Duty evaluation was complete.[94]   He was, however,

permitted to use his accumulated leave time during the suspension, so he did not suffer

any actual loss of pay.[95]

As part of the Fitness-For-Duty evaluation, plaintiff was required to submit to

two psychological evaluations by licensed psychologists of TVA's choosing.[96]   Dr.

Patrick Lavin reviewed plaintiff's medical records, conducted psychological testing,

and interviewed witnesses.   He concluded in a letter dated August 11, 2009, that

plaintiff did not suffer from "a behavioral condition that would prevent safe, stable,

and reliable performance in the workplace or warrant unescorted access

disqualification for psychological reasons.  Consequently psychological clearance is

recommended for:   Unescorted Access Authorization."[97]   Dr. John Haney also

reviewed plaintiff's records and interviewed plaintiff and co-workers.  He concluded,

in a case note dated August 11, 2009, that

> Mr. Coppett is a difficult person, who is struggling to cope with pain and
> neurological impairment causing considerable physical weakness and
> fatigue.  Mr. Coppett is frustrated with medical care providers, TVA
> policies and, specifically, a foreman and a coworker who have
> complained that he is argumentative, not completing work with
> significant attention to detail and has become withdrawn and

---

[94] Coppett Deposition, at 271-72.

[95] Carthen Declaration ¶ 21; Coppett Deposition, at 274-75.

[96] Coppett Deposition, at 277-79.

[97] Coppett Deposition, Exhibit 3, at 3 (Confidential Report of Psychological Assessment
Conducted for the Tennessee Valley Authority's Nuclear (TVAN) Security Program).

23

uncooperative, especially when things do not go his way.

> While these are very troublesome issues, they do not appear to represent a risk of serious loss of emotional control, stability or behavioral reliability.  Rather, they should be dealt with through normal management and disciplinary processes.[98]

Dr. Haney agreed with Dr. Lavin that plaintiff's unescorted access should be restored.[99]

Based on the results of those psychological examinations, TVA's nuclear access organization determined that plaintiff was fit for duty.  Consequently, plaintiff's clearance was restored, and he returned to work on August 24, 2009.[100]

TVA suspended the nuclear unescorted access of eight other employees during 2009, due to concerns about their medication or observations about their behavior. All of those employees were placed on non-work, non-pay status while the investigations were pending, but those who had accumulated leave, like plaintiff, were permitted to use their leave in order to avoid any loss of pay.[101]

Plaintiff sought internal EEO counseling concerning the suspension of his unescorted access on September 24, 2009.  He testified that he waited until that date because he wanted to gather more information about the circumstances leading up to

---

[98] *Id.* at 8.

[99] *Id.*

[100] Coppett Deposition, at 294; Alfultis Declaration ¶ 13.

[101] Carthen Declaration ¶ 21.

24

the suspension decision, even though he suspected that a plot against him existed as soon as he was suspended at the end of May.  He consciously made the decision to wait until approximately thirty days *after* he returned to work from his suspension in order to file the complaint.[102]  Plaintiff also acknowledged that, during the first weeks of his suspension, he could have physically accessed the portion of the Browns Ferry site that housed the EEO personnel, and he could have contacted the EEO office by telephone or electronic mail, but he did not have the pertinent contact information.[103] Even so, on July 1, 2009, plaintiff received a telephone call from Rick Reding, a supervisor, who informed plaintiff that, due to his suspension, he was not allowed to be present at any building on the Browns Ferry site, including the public and office areas.[104]

### 4.    Plaintiff's unreported prescription drug use

TVA's Fitness-For-Duty policy requires all employees with unescorted access to abide by the following reporting guidelines for medication usage:

> Report to your supervisor AND to the Site NPG Medical Office/Nuclear Security (NS), Nuclear Access Services (NAS) Section FFD Staff, the use of prescription or over-the-counter medication (other than aspirin, aspirin substitute, anti-bacterial, and birth control) if the medication may adversely affect your fitness for duty or impair your ability to perform your job duties in a safe & reliable manner.

---

[102] Cooppett Deposition, at 307, 323-25.

[103] *Id.* at 339-41.

[104] *Id.* at 299-300.

Verbally report use of such medications to your supervisor. You are not required to report to your supervisor the specific medication you are taking. Reporting of such medications to the Site NPG Medical Office/NS, NAS FFD Staff shall be specific and shall be by the use of the SPP-1.2-2 sample "Medication Reporting Form," or similar-type form which includes the same information. The preferable reporting method is by hand-carrying the completed form to the applicable medical office. If you are working at a remote (offsite) location, the completed form may be e-mailed or faxed to the medical office/NAS FFD Staff IF accompanied by a direct telephone call to medical office or NAS FRFD staff advising them of the e-mail/fax, in order to preclude the completed form not receiving prompt attention.

Failure to report the use of prescription or over-the-counter medication (other than aspirin, aspirin substitute, anti-bacterial, and birth control) which may adversely affect your fitness for duty or impair your ability to perform your job duties in a safe & reliable manner OR the untimely reporting of such medication usage may result in disciplinary action and/or suspension or denial of [ unescorted access].

The abuse of legal drugs (e.g., prescription or over-the-counter medication) may result in disciplinary action and/or suspension or denial of [unescorted access].[105]

The policy later lists examples of medications that must be reported, including Oxycontin.[106]

Plaintiff was taking Oxycontin in May of 2009. He had previously voluntarily reported the Oxycontin use when he was selected for a random drug screen in March or April of 2009, but he had never reported it on the TVA Medication Reporting

---

[105] Alfultis Declaration, Exhibit 1 (TVA NPG Standard Programs and Processes, Fitness-For-Duty, SPP-1.2, Rev. 0012), at 23 (capitalization in original, alterations supplied).

[106] *Id.* at 67.

Form.[107]  Plaintiff did not experience any adverse side effects from the Oxycontin.[108]

Plaintiff was required to report for a routine medical exam at the TVA medical offices on May 28, 2009.[109]  TVA stated in its verified discovery responses that the exam was to determine whether plaintiff was able to obtain certain clearances that were prerequisites to work as a Tech 2 in TVA's nuclear facilities.[110]  Thus, it appears that this exam was unrelated to the Fitness-For-Duty evaluation TVA conducted for plaintiff in May of 2009.  As part of the May 28, 2009 exam, plaintiff reported that he was taking Oxycontin and other prescription medications.[111]  Karen Thompson, the TVA nurse who conducted the medical examination, had a harsh and aggressive demeanor during the examination.[112]  Thompson also spoke with Alfultis in connection with the examination.  Alfultis told her that plaintiff had become increasingly argumentative, and that coworkers had noted plaintiff's abnormal behavior.[113]

According to plaintiff, the same TVA medical organization that handles random

---

[107] Coppett Deposition, at 259-61.

[108] *Id.* at 265-66.

[109] *Id.* at 257-58.

[110] Defendants' evidentiary submission, Volume VI (Defendants' Combined Responses to Plaintiff's First Interrogatories and Requests for Production), at 16.  Plaintiff has not presented any evidence to refute this assertion.

[111] *Id.*

[112] Coppett Deposition, at 262-63.

[113] Defendants' Combined Responses to Plaintiff's First Interrogatories and Requests for Production), at 16.

drug testing also conducted his May 2009 medical examination.[114]  Even so, he did not think that Karen Thompson was the individual who had administered his random drug test in March or April of 2009.[115]

## D.    The March 2010 Outage

In March of 2010, plaintiff discovered that Phyllis Ricks was again performing the same administrative work order closure duties that he was performing, but she was being compensated as a Tech 3 while he remained a Tech 2.[116]  Ms. Ricks did not suffer any medical constraints at that time, and she was able to perform all of the essential functions of the Tech 3 position.[117]  Alfultis explained that Ms. Ricks had been temporarily assigned to assist with work order closures during a scheduled outage that took place in March of 2010.[118]  During an outage, the plant is not at full generation capacity, and maintenance crews work quickly to complete outage-related tasks so that the plant can return to its normal operations.[119]  The number of work order closures greatly increases during an outage, and all work orders must be closed before the outage can end.[120]

---

[114] Coppett Deposition, at 250, 253-55, 260-61.

[115] *Id.* at 254.

[116] *Id.* at 353-54.

[117] *Id.* at 357-58; Alfultis Declaration ¶ 17.

[118] Alfultis Declaration ¶ 17.

[119] *Id.* ¶ 14.

[120] *Id.* ¶ 15.

Plaintiff contacted an EEO counselor on April 26, 2010, and he filed an EEO complaint on May 5, 2010.[121]  He alleged discrimination on the basis of race, color, sex, disability, and retaliation.[122]  In an attachment to that complaint, plaintiff more fully set out the grounds for his EEO claim:

> Complainant has been discriminated against because of his race, color, and/or sex.  On March 28, 2010, Complainant discovered that a comparator, Phyllis A. Ricks, was again performing the same job as himself, administrative work.  However, Ricks was classified and being paid as a Level [3] craftsman while performing the job, while Complainant was classified and being paid as a Level [2] craftsman.  Complainant was and is qualified to perform the job of a Level [3] craftsman, with accommodation for his disability (MS).  If Ricks does not have a disability and requires no accommodation, then she should be fulfilling the full duties and requirements of a Level [3] craftsman, which involves more than administrative work.  Even if Ricks has a disability and must be accommodated, her pay and classification are still higher than Complainant's, and ostensibly because she is a black, African American female.[123]  She has not been demoted as Complainant has been because of a disability.
>
> After the first instance when Complainant discovered Ricks was being paid more and classified higher to do the same work, Complainant attempted to file a grievance with the union.  However, the union representative refused to formally take the grievance, but kept a copy.  Upon information and belief, the union representative showed the complaint to Ricks.  Complainant was told Ricks was reassigned appropriate work for her classification.  Complainant has suffered harassment and reprisal since, and Ricks has apparently continued to

---

[121] Doc. no. 22 (defendants' memorandum of law in support of motion for partial judgment on the pleadings), Exhibit 13 (May 5, 2010 EEO Complaint), at 1.

[122] *Id.*

[123] The court presumes that plaintiff is Caucasian.  However, because there is no race claim at issue in this lawsuit, there is no specific evidence of plaintiff's race in the record.

perform the same work as Complainant, which Complainant discovered on March 28, 2010.[124]

## III. DISCUSSION

Three aspects of plaintiff's Rehabilitation Act claim remain for consideration at summary judgment: *i.e.,* (1) that TVA pays non-disabled employees more than it pays plaintiff; (2) that plaintiff was denied a permanent position in scheduling/instructing because of his disability; and (3) that plaintiff's suspension pending review of his nuclear unescorted access was the result of unlawful retaliation.

## A.    Disparate Pay

Plaintiff does not claim to have direct evidence of disability discrimination with regard to his pay.  "In the absence of direct evidence of discrimination, a plaintiff may establish a prima facie case of an ADA [or Rehabilitation Act] violation through circumstantial evidence using the familiar burden-shifting analysis employed in Title VII employment discrimination cases." *Wascura v. City of South Miami*, 257 F.3d 1238, 1242 (11th Cir. 2001) (alteration supplied); *see also, e.g., Hilburn v. Murata Electronics North America, Inc.*, 181 F.3d 1220, 1226 (11th Cir. 1999) ("The familiar burden-shifting analysis of Title VII employment discrimination actions is equally applicable to ADA [or Rehabilitation Act] claims.") (citing *Moses v. American*

_____

[124] Doc. no. 22 (defendants' memorandum of law in support of motion for partial judgment on the pleadings), Exhibit 13 (May 5, 2010 EEO Complaint), at 3 (alterations supplied).

*Nonwovens, Inc.*, 97 F.3d 446, 447 (11th Cir. 1996)) (alteration supplied).[125]

To establish a *prima facie* case of disability discrimination, plaintiff must demonstrate:  (1) that he has a "disability" within the meaning of the Act; (2) that he is "a qualified individual with a disability," meaning that he can perform the essential functions of the employment position he holds or seeks, with or without reasonable accommodation being made by the employer; and (3) that he suffered an adverse employment action because of his disability.  *See, e.g.*, *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001); *Reed v. Heil Co.*, 206 F.3d 1055, 1061 (11th Cir. 2000); *Davis v. Florida Power & Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000).

There is no dispute, nor could there be, that plaintiff suffered a disability.  There also is no dispute that being paid less than non-disabled counterparts would constitute an adverse employment action.  Instead, defendants argue that plaintiff was not qualified to be paid as a Tech 3 (which bears on the second element of the *prima facie* case), and that TVA did not pay any *similarly situated*, non-disabled employee more than it paid him (which bears on the third element, *i.e.,* an adverse action taken

---

[125] "Discrimination claims under the Rehabilitation Act are governed by the same standards used in [cases founded upon the Americans With Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.*]."  *Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000) (citing 29 U.S.C. § 794(d)) (footnote omitted, alteration supplied); *see also Holbrook v. City of Alpharetta*, 112 F.3d 1522, 1526 n.2 (11th Cir. 1997).  Thus, "[c]ases decided under the Rehabilitation Act are precedent for cases under the ADA, and *vice versa*."  *Cash*, 231 F.3d at 1305 n.2 (citing *Pritchard v. Southern Company Services*, 92 F.3d 1130, 1132 n.2 (11th Cir. 1996)) (alteration supplied).

*because of* plaintiff's disability).

### 1.    Qualification for the Tech 3 position

Defendants assert that plaintiff was not qualified for the Tech 3 position because he cannot enter and work in the plant on a regular, sustained basis, and because he cannot perform physical work in extreme temperatures.  That argument is based on undisputed facts about plaintiff's limitations, and plaintiff does not attempt to argue in his brief that he *was* capable of performing the duties of a Tech 3 on a sustained basis.  Instead, he makes this unusual argument:

> The work [plaintiff] must be qualified to do is the work he was performing — the work for which he claims the disparity exists.  That work is administrative work, not field work or work inside the TVA plant.  It is undisputed that Mr. Coppett has always been qualified to perform the administrative work at issue in the case.  He has never been subjected to discipline related to performance, TVA's doctors found no reason to conclude he was not qualified to do the work after creditable evaluation and Mr. Coppett's own unrebutted testimony is that he does the work effectively.  There is no evidence Mr. Coppett has not been qualified to perform every position he has been placed in since his diagnosis of Multiple Sclerosis.[126]

There is no authority to support that argument, and it simply is inconsistent with plaintiff's claims.  Plaintiff complains of not being paid as a Tech 3; therefore, it is the Tech 3 position for which he must demonstrate his qualification.  *See Tolley v. Tennessee Valley Authority Bd. of Directors*, No. 3:08–cv–0075, 2009 WL 151569,

---

[126] Doc. no. 51 (plaintiff's response brief), at 16 (alteration supplied).

*8 (M.D. Tenn. Jan. 21, 2009) ("[T]he validity of Tolley's claim relating to the training is entirely dependent upon whether TVA appropriately determined that Tolley would not be capable of performing the essential tasks required by the ultimate job position he sought—that of Level [3] Technician.") (alterations supplied). The undisputed evidence shows that plaintiff could not perform all the duties of a Tech 3. Accordingly, he cannot satisfy this element of the *prima facie* case.

### 2.    Similarly situated, non-disabled employees

Plaintiff also cannot establish that TVA paid similarly-situated, non-disabled employees more than it paid him. He asserts that Phyllis Ricks, who is not disabled, was paid as a Tech 3 while performing the same administrative work as plaintiff, who was being paid as a Tech 2. Those facts are true, but they are of no consequence, because Ricks is not similarly situated to plaintiff. It is undisputed that plaintiff was never elevated to a Tech 3 because he was *permanently* unable to perform the requirements of that position. Ricks, on the other hand, was only assigned to administrative work on a *temporary* basis while she was recovering from a surgery or other *temporary* medical condition. She was otherwise capable of performing the requirements of the Tech 3 position. Plaintiff has offered no authority, and no persuasive argument, that TVA should have been required to reduce Ricks' pay level to that of a Tech 2 while she was temporarily performing administrative duties.

Plaintiff also makes some mention of other allegedly non-disabled Tech 3 comparators who performed administrative work, including Amanda Killborn, Ed Minyard, Steve Watson, and Kenneth Gandy.[127]  It is questionable whether those individuals can be considered as comparators, because plaintiff did not mention them as comparators in his EEO complaint, and there is no indication that they were otherwise addressed during the administrative proceedings.  Even if they can properly be considered, however, there is no evidence that any of those employees had permanent restrictions, like plaintiff's, that prevented them from performing the requirements of the Tech 3 position.  Instead, the evidence demonstrates that each of those employees was *temporarily* assigned to administrative work while they were recovering from surgery or another medical condition.

Because plaintiff cannot establish a *prima facie* case of disability discrimination, summary judgment is due to be granted on his claim that he was paid less than non-disabled workers.

## B.   Instructor/Scheduler Position

Plaintiff appears to assert two separate arguments with regard to the instructor/scheduler position, although the two sometimes are confounded in the parties' briefing.  First, plaintiff asserts that TVA wrongfully failed to provide him

---

[127] *See id.* at 15 n.2.

with instructor training, thus rendering him ineligible for a permanent instructor position.  Second, plaintiff asserts that TVA wrongfully reassigned him from his position as a scheduler, and then wrongfully failed to reinstate him to a permanent scheduler position when other workers were reassigned to the Training Center in July of 2008.  As with the pay claim, plaintiff does not purport to have direct evidence of discrimination.  Accordingly, plaintiff must satisfy the same *prima facie* case: *i.e.,* (1) that he has a disability; (2) that he is a qualified individual with a disability; and (3) that he suffered an adverse employment action because of his disability.

### 1.    Instructor

Although they did not specifically so phrase it, the essential point of defendants' argument is that plaintiff was not a qualified individual with a disability because there is no *reasonable* accommodation that would enable him to perform the essential functions of the instructor position.   A "reasonable accommodation" includes:

> (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

> (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9).[128]

An employer discriminates against an otherwise qualified individual with a disability if the employer fails to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A). An "undue hardship" is "an action requiring significant difficulty or expense, when considered in light of" the following factors:

> (*i*) the nature and cost of the accommodation needed under this chapter;

> (*ii*) the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility;

---

[128] This statutory citation is from the ADA, as are the ones in the following paragraph, but the Rehabilitation Act has adopted the ADA's definition of the term "otherwise qualified individual with a disability." *See* 29 U.S.C. § 794(a) ("No otherwise qualified individual with a disability in the United States, *as defined in section 705(20) of this title*, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.") (emphasis supplied); 29 U.S.C. § 705(20)(B) ("Subject to subparagraphs (C), (D), (E), and (F), the term "individual with a disability" means, for purposes of sections 701, 711, and 712 of this title and subchapters II, IV, V, and VII of this chapter [29 U.S.C.A. §§ 760 et seq., 780 et seq., *790 et seq.*, and 796 et seq.], any person who has a disability *as defined in section 12102 of Title 42*.") (emphasis supplied).

(*iii*) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and

(*iv*) the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative, or fiscal relationship of the facility or facilities in question to the covered entity.

42 U.S.C. § 12111(10).

Defendants first assert that they were not required to provide plaintiff with instructor training. They rely primarily upon the decision of the United States District Court for the Western District of North Carolina in *Riley v. Weyerhauser Paper Co.,* 898 F. Supp. 324 (W.D. N.C. 1995). There, Riley, who suffered from multiple sclerosis and was blind in one eye, had been told by his physician that he could not safely operate or work around machinery. *Id.* at 326. His employment was terminated because his employer could not identify "any reasonable accommodation that would enable [him] to perform the essential functions of an available position for which he was otherwise qualified." *Id.* (alteration supplied). Riley acknowledged that he was unable to perform any manufacturing jobs due to his inability to work with machinery, and that there were no open administrative jobs for which he was qualified, but he asserted that his employer should have provided him with training that would have enabled him to perform the administrative jobs. *Id.* at 328. The district court

37

disagreed with Riley, stating, "it appears to the Court that imposing an obligation on an employer to retrain a disabled employee in a new line of work goes far beyond the intended scope of the ADA to prevent employment discrimination against qualified individuals with disabilities." *Id.*

Other district courts within this Circuit have ruled in a similar way. In *Frix v. Florida Tile Industries, Inc.,* 970 F. Supp. 1027 (N.D. Ga. 1997), the Northern District of Georgia held that the employer was not required to provide the disabled plaintiff with computer training in order to make him qualified for a sedentary position. *Id.* at 1037. In *Turner v. Mobile Infirmary Association,* No. 96-0758, 1997 WL 827532 (S.D. Ala. Oct. 2, 1997), the Southern District of Alabama held in an unpublished decision that the employer was not required to train the disabled plaintiff for a receptionist position, because "the ADA does not require an employer to reassign a disabled person to a position for which he or she is unqualified." *Id.* at *4.

This court is persuaded by the reasoning of those district courts. There is no authority to support plaintiff's assertion that TVA was required to provide him training for a new position in order to accommodate his disability. Moreover, plaintiff never signed an "Expression of Interest" form indicating his interest in instructor training. The submission of an Expression of Interest form is a requirement under TVA's agreements with its trade unions. TVA is not required by the Rehabilitation

38

Act to bypass the requirements of a union agreement in order to provide an accommodation for a disabled employee. *Cf. Davis*, 205 F.3d at 1307 ("[W]e join eight other circuits which have held that an accommodation that contravenes the seniority rights of other employees under a collective bargaining agreement is unreasonable as a matter of law.") (citations omitted) (alteration supplied). Plaintiff attempts to undermine this point by asserting that TVA *did* violate the union agreement because it had already placed plaintiff in an instructor position, even though he had never signed an Expression of Interest form, and had never completed instructor training.[129]   Plaintiff's argument misapprehends the facts.   There is no evidence that plaintiff ever actually worked full-time as an instructor.   Instead, he worked as a training course *scheduler*, with only occasional instructional duties.[130] Plaintiff also points out that he did *verbally* express his interest in taking an instructor course to Susan Camargo, his supervisor at the Training Center.   While true, that ignores the fact that the union agreement required the Expression of Interest form to

---

[129] *See* doc. no. 51 (plaintiff's response brief), at 18 ("As to TVA's contention that allowing Mr. Coppett to work in the position without signing an expression of interest document would violate the union agreement, it is clear it *did* place him into the position without his having done so. This militates against a finding that such an accommodation is unreasonable.") (emphasis in original).

[130] Several of plaintiff's other arguments also confound the two positions.   For example, he asserts that he was qualified for the position he sought, because he had been successfully performing the duties of the position in the past.   Plaintiff also asserts that the position he sought must have been a permanent one, because he believes he had previously been offered that position on a permanent basis.   However, the position plaintiff had been performing was that of scheduler, not instructor. The court will address those arguments in the next section, in the context of the scheduler position.

be submitted *in writing*.

Defendants also assert that, even if plaintiff had received the requisite training for the instructor position, there still existed no reasonable accommodations that would have rendered him qualified to perform the instructor duties on a full-time basis. The court is persuaded by this argument for multiple reasons. First, plaintiff acknowledged that he would be unable to perform the in-plant activities that are required for the attainment and maintenance of instructor certification. Plaintiff has not suggested any reasonable accommodation that would allow him to bypass this requirement of instructor certification. *See Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1367 (11th Cir. 2000) ("The burden of identifying an accommodation that would allow a qualified employee to perform the essential functions of her job rests with that employee, as does the ultimate burden of persuasion with respect to showing that such accommodation is reasonable."). Plaintiff also acknowledged that he would not be able to teach eight-hour-long courses, and it is undisputed that there are not a sufficient number of shorter courses to justify hiring a full-time employee to teach them. It would not be *reasonable* to require TVA to pay plaintiff as a full-time instructor when he could only perform the work part-time. *See id.* at 1367 (holding "that '[a]n employer is not required by the ADA to reallocate job duties in order to change the essential functions of a job.'") (quoting *Holbrook v. City of Alpharetta*,

40

112 F.3d 1522, 1528 (11th Cir. 1997) (alteration in *Earl*)).  *See also Earl*, 207 F.3d at 1365 ("An accommodation is reasonable, and thus required under the ADA, only if it allows the employee to perform the essential functions of the job.") (citations omitted).

Moreover, requiring TVA to reassign plaintiff to a permanent instructor position would not be a reasonable accommodation because there were no permanent instructor positions at the Browns Ferry plant during the relevant time period.  Instead, all instructors were given their assignments on a temporary, as-needed basis.  An employer is not required to create a position in order to accommodate a disabled employee.  *See Willis v. Conopco, Inc.,* 108 F.3d 282, 284 (11th Cir. 1997) ("Reassignment to another position is a required accommodation only if there is a *vacant* position available for which the employee is otherwise qualified.") (emphasis supplied) (citing 42 U.S.C. § 12111(9)(B)); *Dickerson v. Dep't of Veterans Affairs,* 489 F. App'x 358, 361 (11th Cir. 2012) (holding that "the Rehabilitation Act did not require the [employer] to reassign [the disabled plaintiff] to a position where there were no vacancies, create an entirely new position for her, or reallocate the essential functions of her . . . position.") (alterations supplied).

## 2.    Scheduler

Plaintiff also asserts that TVA should have placed him in a permanent position

as a scheduler in July of 2008, when other former Training Center employees were returned to their instructor positions.  As was true with regard to the instructor position, there was no such thing as a permanent scheduler position in 2008.  Plaintiff subjectively believed that his former Training Center assignment, in which he performed primarily scheduling duties, but received an instructor's supplemental pay, was permanent because the union representative who negotiated the position for him never informed him of a time limit on the position.  However, there is no indication that anyone from TVA ever affirmatively indicated that plaintiff's Training Center position would be permanent, and TVA's records indicate that the assignment was temporary.  Moreover, a union representative does not have the authority to create a permanent position for an employee.  Thus, plaintiff's mistaken, subjective belief that the position was permanent is not sufficient to create a genuine issue of material fact. *See Scalone v. Home Depot,* 280 F. App'x 905, 908 (11th Cir. 2008) (holding that an employee's subjective belief that her employer's policy was a mere guideline was not sufficient to create a genuine issue of material fact when the employer produced documentary evidence that the policy was mandatory).  Plaintiff also points to the fact that, after he "was removed from the position along with all the others working [in the Training Center], TVA almost immediately brought everybody back.  This is also

evidence that, at the very least, the positions were ongoing in nature."[131]  The court disagrees with plaintiff's characterization of the evidence.  The fact that other Training Center employees were restored to their former positions indicates that those employees were eligible for *temporary* positions that could be terminated and later renewed, but it does not indicate a *permanent* position.

Moreover, TVA was not required to convert plaintiff's temporary position as a scheduler into a permanent one, or to give plaintiff a permanent promotion, in order to accommodate his disability.  *See Lucas*, 257 F.3d at 1256 (holding that an employer is not required to promote a disabled employee in order to accommodate his disability); *Sidaris v. Runyon*, 967 F. Supp. 1260, 1267-68 (M.D. Ala. 1997) ("An employer has no duty to create a new light-duty position in order to accommodate a handicapped employee.").  It also would not be reasonable to require TVA to grant plaintiff a full-time scheduling position in July of 2008, because the demand for schedulers had decreased, and TVA was not assigning any schedulers who could not also perform instructing duties.  Additionally, because plaintiff was incapable of teaching a full-length, eight-hour course, TVA would have had to superfluously hire an additional employee to perform the instructional duties that plaintiff could not perform.  That is not a reasonable accommodation, especially considering that TVA

---

[131] Doc. no. 51 (plaintiff's response brief), at 18 (alteration supplied).

needed plaintiff to perform work order closures, so that other Tech employees without limitations would be free to work in the plant.

Plaintiff attempts to create a fact dispute on this point by asserting that "he was busy performing his duties in the position through his tenure at the training center."[132] Indeed, plaintiff testified that, when he went on sick leave in May of 2008, there had been a recent increase in scheduling activity.  There is no evidence, however, that the work level continued to decrease after plaintiff left on sick leave, and, specifically, there is no evidence to contradict defendants' assertion that the need for schedulers had decreased in *July* of 2008, when the reassignments were made.

Plaintiff also asserts that he must have been qualified to perform the position of scheduler because TVA would not have placed him in the position if it did not believe he was qualified for it, and because there is no evidence that he ever failed to meet the expectations of the position.[133]  Plaintiff's assertions are supported by the record, but they are not of any legal consequence.  TVA has never disputed that plaintiff was qualified to perform the duties of a scheduler.  Instead, TVA asserts that being required to place plaintiff in a *permanent* position as a scheduler would not be a reasonable accommodation, because there were no permanent scheduling positions at the time, and because plaintiff was needed to perform work in other areas of the

---

[132] Doc. no. 51 (plaintiff's response brief), at 17.

[133] *Id.* at 17.

plant.

In summary, plaintiff has not produced sufficient evidence to create a genuine issue of material fact with regard to his claim that TVA's failure to place him in a permanent position as an instructor or scheduler was the result of disability discrimination.  Accordingly, summary judgment is due to be granted on that claim.

## C.    Retaliation

Plaintiff asserts that TVA's May 28, 2009 suspension of his unescorted nuclear access pending a Fitness-For-Duty investigation was in retaliation for the union grievance he filed regarding his pay on May 18, 2009.

TVA asserts that this court does not have jurisdiction over plaintiff's retaliation claim because the issuance or revocation of a security clearance is within the exclusive purview of the federal agency.  In *Department of Navy v. Egan,* 484 U.S. 518 (1998), the Supreme Court held that the Merit Systems Protection Board did not have the authority to review a decision by the Navy to revoke the security clearance (and, effectively, terminate the employment) of a civilian employee.  *Id.* at 520.  The Court reasoned:

> It should be obvious that no one has a "right" to a security clearance.  The grant of a clearance requires an affirmative act of discretion on the part of the granting official.  The general standard is that a clearance may be granted only when "clearly consistent with the interests of the national security." *See, e.g.*, Exec. Order No. 10450, §§ 2 and 7, 3 CFR 936, 938 (1949-1953 Comp.); 10 CFR § 710.10(a)

45

(1987) (Department of Energy); 32 CFR § 156.3(a) (1987) (Department of Defense). A clearance does not equate with passing judgment upon an individual's character. Instead, it is only an attempt to predict his possible future behavior and to assess whether, under compulsion of circumstances or for other reasons, he might compromise sensitive information. It may be based, to be sure, upon past or present conduct, but it also may be based upon concerns completely unrelated to conduct, such as having close relatives residing in a country hostile to the United States. "[T]o be denied [clearance] on unspecified grounds in no way implies disloyalty or any other repugnant characteristic." *Molerio v. FBI*, 242 U.S. App. D.C. 137, 146, 749 F.2d 815, 824 (1984). The attempt to define not only the individual's future actions, but those of outside and unknown influences renders the "grant or denial of security clearances . . . an inexact science at best." *Adams v. Laird*, 136 U.S. App. D.C. 388, 397, 420 F.2d 230, 239 (1969), *cert. denied*, 397 U.S. 1039, 90 S. Ct. 1360, 25 L. Ed.2d 650 (1970).

Predictive judgment of this kind must be made by those with the necessary expertise in protecting classified information. For "reasons . . . too obvious to call for enlarged discussion," *CIA v. Sims*, 471 U.S. 159, 170, 105 S. Ct. 1881, 1888, 85 L. Ed.2d 173 (1985), the protection of classified information must be committed to the broad discretion of the agency responsible, and this must include broad discretion to determine who may have access to it. Certainly, it is not reasonably possible for an outside nonexpert body to review the substance of such a judgment and to decide whether the agency should have been able to make the necessary affirmative prediction with confidence. Nor can such a body determine what constitutes an acceptable margin of error in assessing the potential risk. The Court accordingly has acknowledged that with respect to employees in sensitive positions "there is a reasonable basis for the view that an agency head who must bear the responsibility for the protection of classified information committed to his custody should have the final say in deciding whether to repose his trust in an employee who has access to such information." *Cole v. Young*, 351 U.S. 536, 546, 76 S. Ct. 861, 868, 100 L. Ed. 1396 (1956). As noted above, this must be a judgment call.

*Egan*, 484 U.S. at 528-29 (alterations in original).

Plaintiff would have this court construe *Egan* very narrowly, to apply only in cases involving either the Merit Systems Protection Board, or "review by one executive agency of the actions of another."[134]  He relies on certain *dicta* from the Eleventh Circuit's 1991 decision in *Horton Homes, Inc. v. U.S.*, 936 F.2d 548 (11th Cir. 1991).   There, the Eleventh Circuit held that federal courts do not have jurisdiction to review a decision by the Internal Revenue Service ("IRS") not to abate the interest due on an income tax deficiency.  *Id.* at 554.  In explaining that holding, the Court stated:

> In many instances, Congress has, without using express statutory language, been held by the courts to have indicated that final discretionary authority is to be lodged in the administrative agency, unreviewable by the courts.  *See, e.g., Department of the Navy v. Egan*, 484 U.S. 518, 108 S. Ct. 818, 98 L. Ed.2d 918 (1988).  That case dealt with the issuance and revocation of security clearance to government employees of sensitive defense agencies. "[I]n *Egan*, the Supreme Court indicated that the determination by an agency whether or not to grant an individual access to secret information lies inherently within the discretion of that agency and that therefore it is virtually impossible for the [administrative agency involved] or a court to review the exercise of such discretion by application of objective criteria." *Jamil v. Secretary*, 910 F.2d 1203, 1205-06 (4th Cir. 1990).  However, even in a context as sensitive as the one which existed in *Egan*, the discretion of the agency, and the unreviewability of the agency's exercise of discretion by a court, may not be absolute.  Thus, "it is arguable that [a government employee seeking security clearance] might have a valid claim of denial of his constitutional rights to equal protection and to be free of discrimination because of national origin." *Id.* at 1209.  In *Jamil*, the Fourth Circuit, citing to *Webster v. Doe*, 486 U.S. 592, 603, 108 S. Ct. 2047, 2053-54,

---

[134] *Id.* at 19.

> 100 L. Ed. 2d 632 (1988), wrote that "before a court concludes that
> Congress has intended to preclude judicial review of a constitutional
> claim, that intent must be clear 'in part to avoid the "serious
> constitutional question" that would arise if a federal statute were
> construed to deny any judicial forum for a colorable constitutional
> claim.'" 910 F.2d at 1209 n. 6.

*Horton Homes,* 936 F.2d at 553-54 (alterations in original, emphasis supplied).

Plaintiff relies upon that passage to assert that the suspension of his nuclear unescorted access should be reviewable in federal court, because, otherwise, he would be denied "any forum to assert his otherwise colorable constitutional claim for violation of his civil rights."[135]   Plaintiff's argument is unpersuasive for several reasons.  First, the cited passage from *Horton Homes* was merely *dicta*.  Despite the Eleventh Circuit's expressed concerns over preserving a judicial forum for the review of constitutional claims, its ultimate decision was that the IRS's actions were not reviewable.  *Horton Homes,* 936 F.2d at 554.  Second, *Horton Homes* concerned IRS procedures, not security clearances or other matters related to national security. Finally, the cited language from *Horton Homes* was equivocal.  The Court stated that, in sensitive situations, the agency's discretion "*may not* be absolute," and that a government employee seeking a security clearance would *arguably* have a claim for denial of constitutional and statutory rights.  *Id.* at 553.  The Eleventh Circuit later clarified its position on the reviewability of security clearance decisions in *Hill v.*

---

[135] *Id.* at 20.

*White,* 321 F.3d 1334 (11th Cir. 2003).

In *Hill,* a civilian employee of the United States Army asserted claims, pursuant to the Rehabilitation Act and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, that he had been denied a security clearance as the result of age discrimination. *Hill,* 321 F.3d at 1335. More specifically, the plaintiff alleged

> that his supervisor initiated disciplinary proceedings against him for charges that he says were false and frivolous and motivated by a desire to discriminate against him because of his age. Plaintiff was suspended for three days pursuant to a final administrative decision. He was required to undergo a mental evaluation and then his security clearance was suspended.

*Id.* The plaintiff — presumably in an effort to bypass *Egan*'s ban on judicial review of security clearance decisions — did not purport to challenge the Army's decision to suspend his security clearance. Instead, he challenged "the initiation of the security clearance investigation, claiming it was improperly motivated by discrimination." *Id.* The Eleventh Circuit agreed with a previous decision of the Fourth Circuit which held that "'[the] distinction between the initiation of a security investigation and the denial of a security clearance is a distinction without a difference.'" *Id.* at 1335-36 (quoting *Becerra v. Dalton*, 94 F.3d 145 (4th Cir. 1996), *cert. denied*, 519 U.S. 1151 (1997)) (alteration in *Hill*). According to the Eleventh Circuit:

> The United States Supreme Court has made clear that a decision concerning the issuance or non-issuance of security clearance is a matter within the purview of the executive and not to be second-guessed by the

49

judiciary unless Congress has specifically provided otherwise. *Department of the Navy v. Egan*, 484 U.S. 518, 108 S .Ct. 818, 98 L. Ed. 2d 918 (1988).  To review the initial stages of a security clearance determination is to review the basis of the determination itself regardless of how the issue is characterized.

*Hill,* 321 F.3d at 1336.

The *Hill* decision cannot be avoided.  Like *Hill,* this case involves a claim that the denial of a security clearance was the result of unlawful discrimination.  The fact that *Hill* involved an Army employee, while the present case involves a nuclear power plant employee, should not make any difference.  The safety and security concerns underlying clearance determinations for access to nuclear power organizations are no less significant than the safety and security concerns underlying military intelligence clearance determinations.

In summary, because this court does not have jurisdiction to review the suspension of plaintiff's nuclear unescorted access, it also does not have jurisdiction over his retaliation claim.  Summary judgment is due to be granted in defendants' favor on that claim.  Moreover, because the court does not have jurisdiction over plaintiff's retaliation claim, there is no need to address defendants' arguments that the claim was untimely asserted, and that the claim should fail on its merits.

## IV. CONCLUSION AND ORDERS

In accordance with the foregoing, defendants' motion for summary judgment

is GRANTED, and all of plaintiff's claims are DISMISSED with prejudice.[136]  Costs

are taxed to plaintiff.  The Clerk is directed to close this file.

DONE this 16th day of December, 2013.

_____

United States District Judge

---

[136] Because summary judgment is being granted in defendants' favor on all of plaintiff's claims, there is no need to consider defendants' argument that plaintiff is not entitled to recover punitive damages from TVA.  *See* doc. no. 44 (defendants' brief), at 30.